Case: 4:14-cv-00408-JAR  Doc. #: 113-1  Filed: 05/09/16  Page: 1 of 6 PageID #: 1381

1

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

SIERRA CLUB,                )
                            )
        Plaintiff,          )
                            ) No. 14-cv-408-AGF
vs.                         )
                            ) The Honorable
UNION ELECTRIC COMPANY, d/b/a) Audrey G. Fleissig
AMEREN MISSOURI,            )
                            )
        Defendant.          )


VIDEOTAPED DEPOSITION OF STEVEN HUGHES

Taken on behalf of Plaintiff

January 20, 2016

(Starting time of the deposition:  9:25 a.m.)

Exh. A

**Page 2**

INDEX OF EXAMINATION
                                                    Page
Questions by Mr. Entin .......................... 9
Questions by Ms. Youngblood ..................... 28

INDEX OF EXHIBITS
Exhibit 1 (Notice of Deposition) ................. 9
Exhibit 1 A (Objections and Responses) ........... 9
Exhibit 2 (2004 E-Mail) .......................... 28
Exhibit 3 (2004 E-Mail Attachment) ............... 40
Exhibit 4 (Missouri Opacity Regulation) .......... 41
Exhibit 5 (Emission Category Codes/Definition) ... 42
Exhibit 6 (Downtime Codes) ....................... 43
Exhibit 7 (2011 E-Mail Chain) .................... 87
Exhibit 8 (Stack Vision Report) .................. 97
Exhibit 9 (Stack Vision Printout) ................ 107
Exhibit 10 (Stack Vision Printout) ............... 109
Exhibit 11 (Not identified) ...................... 136
Exhibit 12 (Labadie 2012 Emission Report)......... 143
Exhibit 13 (Semi-Annual Compliance Certification). 167
Exhibit 14 (Annual Compliance Certification) ..... 207
Exhibit 15 (Code of Federal Regulation Section) .. 215
Exhibit 16 (Labadie Part 70 Operating Permit) .... 242

      (The original exhibits were returned to Mr.
Entin, to be used in the continuing depositions.)

**Page 3**

              IN THE UNITED STATES DISTRICT COURT
              FOR THE EASTERN DISTRICT OF MISSOURI
                        EASTERN DIVISION
SIERRA CLUB,            )
                        )
       Plaintiff,       )
                        ) No. 14-cv-408-AGF
vs.                     )
                        ) The Honorable
UNION ELECTRIC COMPANY, d/b/a) Audrey G. Fleissig
AMEREN MISSOURI,        )
                        )
       Defendant.       )

       VIDEOTAPED DEPOSITION OF WITNESS, STEVEN
HUGHES, produced, sworn, and examined on the 20th day
of January, 2016, between the hours of nine o'clock in
the forenoon and six o'clock in the evening of that
day, at the offices of Ameren Corporation, 1901
Chouteau Avenue, Room W409, St. Louis, Missouri 63103
before BRENDA ORSBORN, a Certified Court Reporter
within and for the State of Missouri, in a certain
cause now pending before the United States District
Court for the Eastern District of Missouri, Eastern
Division, wherein Sierra Club is the Plaintiff and
Union Electric Company, d/b/a Ameren Missouri is the
Defendant.

**Page 4**

A P P E A R A N C E S
For the Plaintiff:
   Mr. Scott A. Entin
   Mr. Ben Blustein
   Mr. David Baltmanis
   Miner, Barnhill & Galland, P.C.
   14 W. Erie Street
   Chicago, Illinois 60610
   (312) 751-1170
   sentin@lawmbg.com
   bblustein@lawmbg.com
   dbaltmanis@lawmbg.com
and
   Mr. James N. Saul
   Earthrise Law Center
   Lewis & Clark Law School
   10015 S.W. Terwilliger Blvd
   Portland, Oregon 97219-7799
   (503) 768-6929
   jsaul@lclark.edu

For the Defendant:
   Ms. Sarah D. Youngblood
   Schiff Hardin
   One Market
   Spear Street Tower, Suite 3200
   San Francisco, California 94105
   (415) 901-8760
   syoungblood@schiffhardin.com
and
   Mr. Matthew Mock
   Schiff Hardin
   233 S Wacker Drive, Suite 6600
   Chicago, Illinois 60606
   (312) 258-5500
   mmock@schiffhardin.com

The Court Reporter:

   Ms. Brenda Orsborn, RPR/CSR/CCR
   Missouri CCR No. 914
   Illinois CSR No. 084-003460
   Registered Professional Reporter.
The Videographer:  Mr. Shaun Steele

**Page 5**

       IT IS HEREBY STIPULATED AND AGREED, by and
between counsel for Plaintiff and counsel for
Defendant, that the VIDEOTAPED DEPOSITION OF STEVEN
HUGHES may be taken in shorthand by Brenda Orsborn, a
Certified Court Reporter, and afterwards transcribed
into typewriting; and the signature of the witness is
expressly not waived.
       VIDEOGRAPHER:  We're on the record.  Today's
date is January 20th, 2016, and the time is 9:25 a.m.
This is the video-recorded deposition of Steven Hughes
in the matter of Sierra Club versus Union Electric
Company doing business as Ameren Missouri, Case No.
14-cv-408-AGF in the United States District Court for
the Eastern District of Missouri, Eastern Division.
       This deposition is being held -- this
deposition is being held at Ameren, 1901 Chouteau, St.
Louis, Missouri 63103.  The reporter's name is Brenda
Orsborn.  My name is Shaun Steele.  I'm a certified
legal videographer, and we are with Midwest Litigation
Services.  Will the attorneys present please introduce
themselves?
       MR. ENTIN:  My name is Scott Entin of Miner,
Barnhill & Galland on behalf of Sierra Club.
       MR. BLUSTEIN:  Ben Blustein, Miner, Barnhill
& Galland in Chicago on behalf of Sierra Club.

**Page 6**

MR. BALTMANIS: David Baltmanis, Miner, Barnhill & Galland, on behalf of Sierra Club.

MR. SAUL: James Saul of the Earthrise Law Center on behalf of Sierra Cub.

MS. YOUNGBLOOD: Sarah Youngblood, Schiff Hardin, on behalf of defendant Ameren Missouri, and I'm joined by my partner, Matt Mock.

VIDEOGRAPHER: Will the court reporter please swear in the witness?

STEVEN HUGHES, of lawful age, being produced, sworn and examined on behalf of the Plaintiff, deposes and says:

VIDEOGRAPHER: Counsel, you may proceed.

EXAMINATION
QUESTIONS BY MR. ENTIN:

Q. Good morning.
A. Good morning.
Q. How are you today?
A. I'm good.
Q. Okay. Bet you'd rather be other places. As you just heard, my name is Scott Entin. I represent Sierra Club in this case. We're here for the 30(b)(6) deposition of Ameren. Do you understand that Ameren has designated you to speak on behalf of the corporation on a matter of -- on a number of topics?

**Page 7**

A. Yes.
Q. Okay. Before we get into the questions, I just want to go over a few ground rules with you. Generally, I like to take a break every hour. The deposition is not an endurance test. I just ask that if you need a break, let me know, and I will do my best to accommodate you as quickly as possible. I ask only that there is no question pending when we take a break; is that fair?
A. Yes.
Q. Okay. Your answers today, even though you're being recorded and videoed here, they need to be audible, out loud. So even though, you know, typically in conversation you might shake or nod your head, if your answer is yes or no, you need to give that answer out loud. Fair?
A. Yes.
Q. The same with "uh-huh," "uh-uh." Everyone does it during the course of a deposition. If I hear it, your counsel or I will correct you and make sure we understand that that was a "yes" or a "no." Okay?
A. Yes.
Q. The most important rule -- I'm sure I'll think of another at some point, but the most important rule during the course of the deposition is that if

**Page 8**

you answer a question that I ask or that your counsel asks, the record is going to reflect that you perfectly heard that question and perfectly understood that question. So it's very important that if you don't understand a question or haven't heard it properly, that you either ask me or the court reporter to rephrase the question or to ask it again; is that fair?
A. Yes.
Q. Okay. Is there any reason why you are unable to give truthful testimony here today?
A. No.
Q. Okay. Have you ever given a deposition before?
A. No.
Q. Okay. Have you ever given any kind of testimony before?
A. No.
Q. All right. You've never testified in front of any governmental body or regulatory committee?
A. I have given comments in front of EPA regarding regulations, proposed regulations. Does that fit into that category?
Q. Generally. Generally. And -- and that's really the extent of any sort of testifying that you

**Page 9**

can think of that you've done; is that fair?
A. Yes.
Q. Okay.
A. To the best of my recollection.
[Marked Exhibit No. 1.]
Q. (By Mr. Entin) Okay. Sir, you've just been provided a copy of what's been marked as Deposition Exhibit 1 to the Ameren 30(b)(6) deposition. Do you have that in front of you?
A. Yes, I do.
Q. Okay. Have you seen that document before?
A. Yes.
Q. Okay.
MS. YOUNGBLOOD: And, Scott, if I could just jump in real quickly, just for a procedural matter, if we could go ahead -- I guess we can mark this as Exhibit A for ease. I just want to get our objections marked.
MR. ENTIN: Sure, I don't have a -- we can mark Exhibit 1A.
[Marked Exhibit No. 1A.]
MS. YOUNGBLOOD: 1A, okay. That's fine with me. And just for the purposes of the record, we just marked Exhibit 1A, which is the objections and responses to Plaintiff's amended notice of Rule

226

1  or shutdown would never be coded as Reason Code 1,
2  correct?
3       A.  Say that again.
4       Q.  Sure.  An excess emission having -- strike
5  that.
6           An excess emission resulting from an issue
7  related to startup or shutdown would not be
8  categorized as Reason Code 1, correct?
9       A.  No, that's not correct.  You could have
10 pollution control equipment failure if that was the
11 cause.  If it wasn't a startup or shutdown-related
12 cause -- if it was due to a TR set malfunctioning or
13 whatever, an SO3 system, they were having trouble
14 getting it started up during startup, which happens,
15 then that air pollution control equipment failure
16 would be the code that would be used, not startup,
17 because it didn't happen because of startup.  It
18 happened because they couldn't get the SO3 system
19 fired up or whatever the control equipment problem
20 was.
21      Q.  Okay.  If Reason Code 1 is assigned to an
22 excess emission, it is not the result of startup or
23 shutdown, correct?
24      A.  Correct.  Well, yeah.  It could be during a
25 startup or shutdown, but if you assign Reason Code 1,

227

1  it should be because of something with the precips or
2  the SO3 injection system.
3       Q.  And this may seem -- again, this may seem
4  very basic, but it's important that I have all of this
5  straight on the record.  Okay?  So please indulge me
6  with your patience.  When you use the term "precips,"
7  you're referring to ESPs, the ESPs, correct?
8       A.  Yes, electrostatic precipitator is what ESP
9  stands for.
10      Q.  Right.  And just -- I need the record clear
11 on this last question.  When Reason Code 1 is assigned
12 for an excess emission, that excess emission is not
13 the result of startup or shutdown, correct?
14      A.  Yes.  If a No. 1 is assigned, it's because
15 the excess emission was caused because of the air
16 pollution control equipment.
17      Q.  Right.
18      A.  Regardless of whether it was startup or
19 shutdown --
20      Q.  Okay.
21      A.  -- or baseline or whatever load you're at.
22 You're asking me the same thing over and over.  I
23 don't understand --
24      Q.  I -- work with me, and we'll get through
25 this quickly.  Okay.  Reason Code 2, fuel problems.

228

1  The definition for Reason Code 2 is intended -- or
2  strike that.
3           "Reason Code 2 is intended to cover any
4  problem relating to the quality of the fuel ultimately
5  burned at non-FGD facilities."  Do you see that?
6       A.  Yes.
7       Q.  What does "FGD" stand for?
8       A.  It stands for fluidized gas desulfurization.
9  That's probably known maybe by you as a scrubber.  We
10 don't have any scrubbers at any of these three plants
11 that we're talking about.  We have one at our other
12 plant.  We have two of them at our other plant.
13      Q.  "Blending or cleaning problems would also be
14 characterized as fuel problems, as would the use of
15 high sulfur fuel because of an interruption in the
16 supply of complying fuel or because of a supplier's
17 error or an error in coal sampling and analysis
18 results," et cetera, correct?
19      A.  Correct.
20      Q.  When Reason Code 2 is assigned, that is the
21 cause of the excess emission, correct?
22      A.  Correct.
23      Q.  That's been quality assured through the many
24 levels we've discussed at points of the deposition
25 today, correct?

229

1       A.  Correct.
2       Q.  That excess emission is not the result of
3  air pollution control equipment failure, startup or
4  shutdown, correct?
5       A.  Correct.
6       Q.  Okay.  Reason Code 3 is process problems,
7  and it is intended to cover on-site equipment
8  failures, other than control equipment, correct?
9       A.  Correct.
10      Q.  When Reason Code 3 is assigned, the excess
11 emission is not the result of startup or shutdown,
12 correct?
13      A.  Correct.
14      Q.  And it's not the result of air pollution
15 control equipment failure either, correct?
16      A.  Correct.
17      Q.  "Reason Code 4, unknown cause, is intended
18 to apply to all excess emissions for which the
19 operator must guess at the reason (even though his
20 guess might be a good one)."  Did I get that
21 correctly?
22      A.  Yes.
23      Q.  Okay.  "It would not apply to an equipment
24 failure even though the reason for failure is not
25 known."  Did I read that correctly?

230

1   A.  Yes.
2   Q.  Can you explain that last sentence to me?
3   A.  "Would not apply to an equipment failure
4  even though the reason for failure is not known."  I'm
5  drawing a blank here.  My mind is not working for me
6  here.
7   Q.  Let's take a --
8   A.  "Would not apply to an equipment failure."
9   Q.  I'm going to ask you a different question,
10  and we can come back to this.  Okay?
11   A.  Okay.
12   Q.  All right.  When Reason Code 4 is assigned,
13  the reason for the excess emission is not startup and
14  is not shutdown, correct?
15   A.  Correct.
16   Q.  And it is not air pollution control
17  equipment failure, according to this last sentence.
18  Would you agree with that?
19   A.  There's -- probably not, but there's no way
20  to be sure because you don't know what caused it.
21   Q.  And is there a QA process specific to
22  unknown cause that maybe is unlike the other reason
23  codes that are assigned?
24   A.  By QA process, the only QA process would be
25  trying to figure out what could have caused it, and if

231

1  you can't find anything, it's an unknown cause.  And
2  that's the processes.  You go through the same
3  avenues, and when you can't find anything, you end up
4  putting down "unknown."
5   Q.  So when -- when Reason Code 4 is assigned to
6  an excess emission, the unit operator has taken his or
7  her best guess at the cause of the emission, based on
8  what he or she has seen in the control room, seen on
9  the monitors and just generally observed, correct?
10   A.  Correct.
11   Q.  Then once that Reason Code 4 has been
12  assigned, at some point it's going to be observed --
13  strike that.
14       Reviewed by maybe the shift supervisor or
15  someone else at that plant, correct?
16   A.  And then by the plant engineer.
17   Q.  And then by the plant engineer or the --  the
18  plant CEMS engineer or the CEMS specialist, correct?
19   A.  Correct.
20   Q.  And those individuals also, you would
21  expect, would try to identify the cause based on the
22  sources of information available?
23   A.  Possibly.  Possibly they may just go with
24  the unknown.  If it's the only one they've seen from
25  that unit for quite a while, they may say, "Hey, the

232

1  operator just couldn't figure it out, so that's the
2  way it is."
3   Q.  And then eventually that excess emission
4  gets to you or your office, and it's quality assured
5  there to make sure the most accurate information is
6  provided with respect to that event, correct?
7   A.  There again, if it's an outlier.  If it's --
8  if there's not a rash of these unknowns down, if it's
9  the only one, then I would probably assume, hey, this
10  operator -- this engineer out there has looked into
11  this, or there's just nothing there, and we go with
12  it.  There's only a certain amount of detail we can
13  put into this work.  You know, there's -- like I said
14  earlier today, we're talking about over 5 million
15  opacity periods that came into this -- this deposition
16  and, what, close to 5,000 exceedances, I believe.  So
17  that's a lot of review.  There's just not enough time
18  to go to the level of detail that you're talking about
19  on every single one.
20   Q.  I'm not suggesting -- I don't mean to be
21  suggesting that Ameren should be going into any
22  different level of detail when assigning Reason Code
23  4.  I just need to make sure that I understand that
24  Ameren's operators -- well, strike that.
25       When Reason Code 4 is assigned, Ameren's

233

1  operators, who are the folks on the ground when the
2  exceedance is occurring, seeing the equipment,
3  observing all the data and information available to
4  them, they have assigned Reason Code 4, and that's
5  their best estimate of the reason for the exceedance,
6  correct?
7   A.  Correct.
8   Q.  Then there is a second and maybe even a
9  third level of review before it gets to you, during
10  which shift supervisors or other personnel who are
11  also in the control room or potentially in the control
12  room during that exceedance period have an opportunity
13  to observe all of the data available and identify a
14  reason code, yet unknown cause is their best estimate
15  of the potential cause for that exceedance, correct?
16   A.  And it's not just for unknown cause.  It's
17  for all eight of these causes.  The same applies.
18   Q.  The same applies?
19   A.  We do our best at identifying what caused
20  the excess emission and apply that code.
21   Q.  Correct.  And then after the shift
22  supervisor or that secondary level of personnel who
23  might be in the control room, there's also a devoted
24  specialist or engineer in each plant who reviews the
25  reason codes, reviews the data available, if there's a

234

1  question about the best identifier for a reason code
2  or the best reason code to apply, and that process
3  occurs, correct?
4      A.  Correct.
5      Q.  And then it gets to you, and you have the
6  same opportunity, and at the end of the day, when that
7  Excess Emission Report goes out to the DNR, it has
8  gone through multiple levels of review at Ameren.
9  Ameren has done everything in its capability to assign
10 the most appropriate reason code for each exceedance,
11 correct?
12     A.  That's correct.
13     Q.  Reason Code 5 is startup, and that's also
14 defined in the Code of Federal Regulations section
15 that I marked as -- I think it's Exhibit 15 to the
16 deposition, but it's also quoted here in part in
17 Exhibit 5, correct?
18     A.  Correct.
19     Q.  And so if the cause, the specific cause, of
20 an excess emission was the startup process, this is
21 the code that is applied, correct?
22     A.  That's correct.
23     Q.  Okay.  And so if there was some sort of air
24 pollution control equipment failure that occurred, but
25 was not the cause of the excess emission, then

235

1  startup -- and startup was -- startup is the code that
2  should be applied in that hypothetical scenario,
3  correct?
4      A.  That's correct.
5      Q.  Okay.  Reason Code 6 is soot blowing.  And
6  it refers to "The periodic removal of soot, slag
7  and/or fly ash from the firebox walls or the tubes of
8  fuel burning equipment by the use of compressed air,
9  steam or water."  Did I say that right?
10     A.  Yes.
11     Q.  Soot blowing is a regular process that's
12 necessary at coal-fired power plants, correct?
13     A.  Correct.
14     Q.  And occasionally there might be an excess
15 emission event that is caused by the soot-blowing
16 process procedure, correct?
17     A.  That's correct.
18     Q.  And when that happens, soot blowing, Reason
19 Code 6 is applied to the excess emission, correct?
20     A.  That's correct.
21     Q.  And so that excess emission, when Reason
22 Code 6 is assigned to it, is not caused by control
23 equipment failure, startup or shutdown, correct?
24     A.  That's correct.
25     Q.  Okay.  "Reason Code 7, other known causes."

236

1  And this reason code is intended to cover all known
2  causes of excess emissions that are not already
3  covered, correct?
4      A.  That's correct.
5      Q.  Okay.  Reason Code 7 would never be applied
6  if there was some sort of equipment -- air pollution
7  control equipment failure, correct?
8      A.  No, it shouldn't be.
9      Q.  And Reason Code 7 would also never be
10 assigned when the cause of the excess emission was a
11 startup or shutdown event, correct?
12     A.  No, it should not be.
13     Q.  If there is some sort of time testing going
14 on at Ameren and you notify the DNR that you're going
15 to be testing in a week or two and there might be some
16 excess emissions, is that the type of scenario where
17 Reason Code 7 would apply if, in fact, there were
18 excess emissions during that testing?
19     A.  Yes, exactly.
20     Q.  Okay.  Generally, are there other scenarios
21 that you can identify for the record today that --
22 where other known causes, Reason Code 7 would apply?
23     A.  None that I can think of.
24     Q.  Okay.  That brings us to Reason Code 8,
25 shutdown.  That's also defined by 480CFR60.2, correct?

237

1      A.  Correct.
2      Q.  And that reason code is only assigned when
3  the excess emission is caused by the shutdown or
4  cessation of operation of the facility, the unit,
5  correct?
6      A.  Correct.
7      Q.  Okay.  If there's an air pollution control
8  equipment failure, it would not be assigned Reason
9  Code 8, correct?
10     A.  Correct.
11     Q.  At the bottom right-hand corner of Exhibit
12 5, do you see the date March 29th, 1989?
13     A.  Yes.
14     Q.  Did you know that that was my dog and my
15 grandmother's birthday?
16     A.  No, I didn't know that.
17         MS. YOUNGBLOOD:  Your dog was born in '89
18 and your grandmother was born in '89?
19         MR. ENTIN:  Well, not '89.  You got me.
20 It's not -- imprecisely my question once again.  March
21 29th.
22     Q.  (By Mr. Entin) Anyway, is there any
23 significance to you or Ameren of that date?
24     A.  That's the date that I created that Word
25 document.  We barely had PCs then, so --